Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor

v.

AMARILLO GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS LOCAL UNION NO. 577.

Civ. A. No. 2951.

United States District Court
N. D. Texas,
Amarillo Division.

Jan. 12, 1963.

Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Civil Division, Department of Justice, Washington, D. C., George Avery, Sol., Department of Labor, Silver Spring, Md., Barefoot Sanders, U. S. Atty., Dallas, Tex., by: Melvin M. Diggs, Asst. U. S. Atty., for plaintiff.

Mullinax, Wells, Morris & Mauzy, Dallas, Tex., for defendant.

DOOLEY, District Judge.

This is an action brought by the Secretary of Labor, pursuant to the L.M.R.D. Act of 1959, to set aside an election of union officers held by Local Union No. 577, the herein defendant labor organization, on December 10 and 11, 1960. Jurisdiction is invoked under the pertinent provision of said Act codified as Title 29, § 482(b), U.S.C.A. Five members of said Local No. 577, which is subject to said Act, were receptive nominees at a preced-

ing union nomination meeting held November 2, 1960, for election to certain respective union offices, but the union executive board, as a committee to determine eligibility of nominees at said nomination meeting, ruled that each of said five nominees was ineligible to hold union office since not in good standing because of alleged failure to comply with union constitution and by-law requirements for payment of dues in advance on or before the first business day of every month for each of the twenty-four consecutive months preceding the nomination date.

The said union members ruled out as nominees, thereafter having satisfied the intervening requirements, filed a complaint with the Secretary of Labor and as an outgrowth thereof this suit was filed to declare the election of December 10 and 11, 1960, to certain of the union offices null and void and for judgment directing the conduct of a new election for such offices under the Secretary's supervision.

The relevant provisions of the union constitution and by-laws, both require continuous good standing for a two year period to support eligibility to office. The International Union Constitution reads:

"To be eligible for election to union offices of a local union * * * a member must be in continuous good standing for a period of two (2) years prior to nomination for said office, * * *."

The local union bylaw requires

"such continuous good standing for each month in the two (2) year period immediately prior to nominations,"

as a qualification for office.

The International Constitution also provides:

"All members paying dues to local unions must pay them on or before the first business day of the current month, in advance. Where membership dues are being checked off by the employer, pursuant to properly executed check-off authorization, it shall be the obligation of the member to make (1) payment of one (1) month's dues in advance to insure his good standing for each consecutive month for which the monthly check-off is made. Any member failing to pay his dues at such time shall not be in good standing."

The employer of each of the five union members in question, respectively, was a party to a collective bargaining contract with the defendant union, which provided in part as follows:

"The employer agrees to check-off the union membership dues, consisting of monthly dues, initiation fees and uniform assessments for all union employees covered by this agreement, provided that the union delivers to the employer a written authorization, signed by the employee, irrevocable for one year or expiration of this agreement, whichever shall occur sooner. The union shall certify to the company in writing, each month, a list of its members working for the employer who have furnished to the employer such authorization, together with an itemized statement of all dues, initiation fees, and uniform assessments owed, to be deducted for such month from the pay of each member. The company shall deduct and remit to the union in one lump sum the amount so certified in respect to such member from the first pay check of such member following the receipt of such certification statement, and within seven (7) days following such deduction remit the same to the union. Check-off procedure and timing may be worked out locally."

Each of the aggrieved union members aforesaid had, more than twenty-four months previous to the said union nomination meeting in November 1960, executed a check-off authorization card, providing in material part as follows:

"I, the undersigned member of Local Union No. 577 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, of Amarillo, hereby authorize my em-

ployer to deduct from my wages each and every month my union dues consisting of initiation fees, monthly fees and uniform assessments owing to such local union as a result of membership therein, and direct that the amount so deducted be sent to the Secretary-Treasurer of such local union for and on my behalf."

None of these particular union members had ever revoked such check-off authorization prior to the above union meeting.

■ The dominant statute bearing on this litigation is in the provisions of Title 29, § 481(e) U.S.C.A., reading in presently crucial part as follows:

"(e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to Section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. * * Each member in good standing shall be entitled to one vote. No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. * * * The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this subchapter."

The record shows that although it was the practice of the defendant union to mail a statement of each employee's union dues to the particular employer on the last day of the second month preceding the month for which the dues were to be deducted, and under the terms of the collective bargaining agreement, the employer was to make the deductions from the first payroll following receipt of that statement, such deductions nevertheless were not always made and the dues money remitted in accordance with such agreement, but frequently varied considerably during the years of 1959 and 1960. In other words, there was no rigid uniformity about it and, in particular, the dues of the aggrieved members in question were some time deducted in strict accordance with the provisions directing such deduction to be made in the first pay period of the month next preceding the given accrual month, but just as often same were not deducted until another later pay period in that preceding month, or even the last pay period of the second preceding month. The defendant union accepted all said irregular dues payments and for aught shown acquiesced in such variations from the strict letter of the check-off provisions of the collective bargaining agreement. This calls to mind again that sentence in the collective bargaining contracts reading, "Check-off procedure and timing may be worked out locally."

It is noteworthy that in the instance of each aggrieved member, whose eligibility for office was challenged, the dues item, though not actually paid to the union in advance, was paid during the month for which it was owed and the union accepted such payments without any evident complaint. It is well worth emphasizing that there were no delinquent dues against any one of the aggrieved members at the time of the nomination meeting in November 1960.

Something more than a coincidence may be latent in the circumstance that the alleged fault raised against each of these members at the time of the union nomination meeting had to do with a dues accrual timed for payment at or about the vacation period of the particular member.

An examination of the defendant union's dues ledger cards of 196 union members out of 238 attending the said union nomination meeting disclosed that the cards covered 16 months preceding that meeting, that is from July 1959 through November 1960. A list of those members, showing the result of such check and examination was introduced in evidence. Of those 196 members, 31 were found to be new members and transferees ineligible by reason of not having been members for as long as two years; 73 were found to be eligible and in good standing; 48 were found to be ineligible and not in good standing, by reason of not having paid their union dues on or before the first business day of the month when due for each of the successive 16 months next previous to said nomination meeting. The other 42 member cards were in the dead file and there was not time enough to find and examine those cards. Obviously, if the cards for the eight month period preceding July 1959 had been examined, it is certain that the number of ineligible members out of the 121 sum aforesaid (73 eligible and 48 ineligible) could not have decreased, and likewise the number of eligible members therein could not have decreased. Now taking the 121 as a basis and striking 48 of that group as being ineligible, it follows that more than 40% of the long standing members present, who otherwise would have been eligible, were held ineligible solely by reason of the requirement that dues be paid on or before the first business day of the month when due month after month. The 31 ineligibles as newcomers are left out in the above discussion.

A chart, reflecting the results of a recent study made by the Department of Labor Bureau of Labor-Management Reports, concerning the constitutions of 70 international unions, in effect in December 1960, as to eligibility requirements for nomination to local union offices, shows the information next stated. The said international unions had a combined total of 14,654,934 members in the United States. Only one union, other than the International Brotherhood of Teamsters, namely the International Union of Operating Engineers, had a period of good standing membership rule coupled with the requirement that payment of dues be made on or before the due date, with no grace period, but that latter union required only one year's membership. Besides the 1,484,433 members of the International Brotherhood of Teamsters, et al., only the 291,000 members of the International Union of Operating Engineers, the 159,384 members of the Brotherhood of Railroad Trainmen and the 75,000 members of the Barbers, et al., International Union of America, out of the whole total of 14,654,934 union members, were under a similar inflexible requirement of punctual payment of dues in advance to maintain good standing membership. Two of said last named three unions, however, the Barbers, et al., Union and the Railroad Trainmen Union did not go along with the Teamsters pattern of a relatively long period of membership as a condition precedent for holding office. On the contrary, said two had no prerequisite at all of that kind in their union constitutions. Most of the unions with a period of membership rule also required concurrent continuity of good standing status. The report further shows that the four unions last named above are the only ones of the 70 unions covered in the study which were rigid on punctual payment of dues, and all of the other 66 unions in their constitutions allowed the tolerance of a grace period varying from a minimum of ten days to a maximum of six months, but with the heavy majority concentrated in the periods of one, two and three months of grace on arrears of dues. The report thus negatives that there had been any widespread adoption in the labor movement of the kind of union rule making good standing dependent on a lengthy waiting period coupled with the requirement that payment of dues for every consecutive month be made with absolute punctuality on or before the due date.

The above review demonstrates that the Teamsters Union went beyond the mark of all the other unions in the stringency of its compound of mandatory requirements to maintain good standing membership. Most of the other unions either had no period of membership stipulation, or else the requirement was for only one year or less, and even the other unions, which had a requirement of two or three years, all at the same time had a dues payment grace period. All but a few of the unions with a time membership rule also called for continuous good standing status during that time. It seems that a good number of the unions, having a dues payment grace extension, at the same time let a member remain in good standing during the grace period.

A very significant thing is that the International Brotherhood of Teamsters adopted at its convention in Miami, Florida, on July 3–7, 1961, after the institution of this action, a new constitution and in Article 10, Section 5(c) thereof declared in part as follows:

"All members paying dues to local unions must pay them on or before the last day of the current month. * * *"

Manifestly that provision, if in existence at the time now in issue, would have avoided this controversy, for the dues items then questioned to impeach the good standing of said five members had been in the instance of each item fully paid in the current month marking the accrual of such dues items.

The union constitution and by-law provisions governing the eligibility of members for union offices at the time in question, copied at the outset hereof, in the natural course of the functional design thereof, had the ingredients of the sharp impact and burden now urged by the local union against its members. In short, these five members of the defendant local union had carried out their prerequisite period of two years continuous membership, even more, and for all of that two years the payable in advance union dues had been punctually paid month after month by check-off payments, in literal fact or in exoneration effect under § 481(e), for each of said members, unless the alleged delinquencies cited by the defendant union are exceptions and, if same are valid exceptions, then the consequences which the defendant union would put on its said members are (1) to strike from their long membership span the segment of two years next preceding the nomination meeting of November 1960, as any support toward eligibility for office, and (2) to make them continue their good standing and dues paying record until, perchance, they could display a later fault proof record over a new span of two years membership. That would mean an arduous task under the former regimen, when a slip of one day in dues payment could have spoiled the conscientious effort of a year or more. Even if the members had finally perfected clear eligibility for office they still might have faced a weary wait of a year or more before they could exercise their eligibility at the next nomination meeting of the local union. Of course, the demands have been eased by the 1961 constitution adopted at Miami. All in all the former plan of local government was plainly suited to cultivate entrenched management of the defendant union and fell well short of a rightful measure of democratic unionism.

The dues check-off arrangement in this and other unions was initiated and conducted primarily to aid the unions, rather than the employers. It provides the union with a convenient, economical and effective method that serves to better stabilize the financial affairs of the union. It also may be handy for many of the union members, but it is not of any marked benefit to the employer. In any event, the union management likes to have the system.

This directs attention again to what happened in the working of the check-off as it affected the five union members in question. The dues payment of member Williams, owed for August 1960, cited by the defendant as a late payment,

was not deducted by the employer ahead of time, but could have been deducted from his pay check of July 30, 1960, when he was paid wages in the amount of $217.78. This failure was either a delay or default by the employer in check-off performance. The dues payment of member Davis, owed for the month of January 1960, was also cited as a late payment, but the fact is that his dues for said month were deducted by check-off from his pay check of January 2, 1960, which was the first regular business day of that month. A second ground for his alleged disqualification was that his dues payment owing for the month of June 1960 was not paid in time, but the record shows that said dues could have been deducted by check-off from his pay check of May 28, 1960, at which time he was paid $218.07 in wages. Again a check-off failure of the employer. The dues payment owing by member Nolan for August 1960, cited by the defendant as a late payment, was not deducted ahead of time, but could have been deducted from any one of his pay checks of July 16th, July 23rd and July 30th, on which dates he was paid wages of $172.38, $204.24 and $189.06, respectively. Again a check-off failure of the employer. The dues payment of member Riddle, owed for September 1960, cited by the defendant as a late payment, was not paid in time, but he worked and was paid wages on every pay day during the month of August 1960, from any of which his September dues could have been paid by check-off deduction, but there was inaction. Again the check-off performance was at fault. The dues payment of member Doerfler owed for July 1960, cited by the defendant as a late payment, was not paid in time, but the record shows that said dues could have been deducted by check-off from his pay check of June 4, 1960, at which time he was paid $209.29 in wages, or could have been paid out of and charged against the wages he must have been earning all during the month of June, as his pay check of July 2, 1960 was for the sum of $232.79. His dues payment for said

month of July 1960 was actually paid by check-off from his pay check of July 9, 1960. Again employer failure. The particular employers at fault in these various instances might fairly think the union should take some of the blame. The employers and the union worked along together in execution of the check-off plan and the union evidently acquiesced in the irregular pattern practiced by the employers, which was fraught with hazard to the good standing status of employees. This did not in actual outcome deprive the union of any dues payments.

It justly follows that all of the disqualifications ruled against said members for alleged late payment of dues rested on instances which reflected on the part of the particular employer in the discharge of the check-off plan and, accordingly, that said members are shielded from any prejudice in this connection under § 481(e).

Next it is well that attention revert to the question of reasonableness vel non of the union constitution and by-laws for final determination of that question against the background of this litigation. In general appraisal it has been noted that said organizational framework will bear the rating of the most exacting among 70 representative unions. In particular, there is found an obvious brake from a blend of membership length of time and regularity of punctual dues payment in advance which force a fairly long period between a beginner member and his goal of eligibility for union office, and likewise even in the case of an old member who has made a slip in consecutive advance dues payment, no matter how inadvertent and no matter how slightly late, even if it be no more than one day, and as a consequence has to begin over again, working towards eligibility status. It is true enough that a union organization has the right to exercise proper discipline of members and prescribe conditions which may be tests of good faith or designed for tokens of interest in the welfare of the union, such as an extended period of membership, or regular attendance at meetings,

80

and, of course, the union to survive must have authority to impose dues and take measures to effect the regular and reliable receipt of such income, but there must be a line drawn some where between moderation and extremism, and this present lawsuit illustrates the problem. The record shows that about 40% of the members present at the nomination meeting in November 1960, that is who had been dues paying members for the required minimum of two years, could, on like ground, have been found ineligible for union office. The advance dues paying requirement was at the root of disqualification in the instance of all these five members. One alleged late payment involved only one day. The LMRD Act was intended in one major purpose to foster a better democratic process in the conduct of labor unions. There is no showing in this record that the legitimate needs or necessities of the defendant union fairly called for its rigid cast of government. The very demonstration of the nomination meeting in question goes to show an undesirable lack in the spirit of better democracy in the conduct of this union. The requirements of the union invoked in the determination that these members were ineligible for union office were unreasonable. Johnson v. Local Union No. 58, International Brotherhood of Electrical Engineers, D.C., 181 F.Supp. 734, 737.

The defendant union relies on the case of English v. Cunningham, 108 U.S.App. D.C. 365, 282 F.2d 848, but the court in that case dealt with a voluntary rule of the union and the holding was prompted by a sense of deference to an interpretation made of said rule by the union president, and plainly that approach would be misplaced in dealing with the present statute law.

Judgment will be rendered for the plaintiff against the defendant on the two grounds, that is, (1) the check-off dues paying facts saved the five union members from any valid loss of eligibility, and (2) the union rules relied on were unreasonable as a basis to defeat the eligibility of these union members.