W. Willard **WIRTZ**, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

**HOTEL, MOTEL AND CLUB EM-
PLOYEES UNION, LOCAL 6,**
Defendant.

No. 66 Civ. 626.

United States District Court
S. D. New York.

March 20, 1967.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for plaintiff; Robert E. Kushner, Ronald P. Huntley, Asst. U. S. Attys., of counsel.

Cohn & Glickstein, New York City, for defendant; Sidney E. Cohn, Jerome B. Lurie, Leonard Leibowitz, New York City, of counsel.

WYATT, District Judge.

The principal question here is whether prior service as a Union officer, on a Union Board, or in the Union Assembly, is a "reasonable" qualification, under the Landrum-Griffin Act, for candidacy for office in the defendant Union.

Section 401(e) of the Act (29 U.S.C. § 481(e)), which may also be cited as the Labor-Management Reporting and Disclosure Act of 1959, provides that in any union election required by the Act "every member in good standing shall be eligible to be a candidate and to hold office (subject to * * * reasonable qualifications uniformly imposed)".

This action, tried to the Court without a jury, was brought by the Secretary of Labor to declare void, etc. an election of officers of defendant Union ("the Union" or "Local 6") held on May 19, 1965. The action is authorized by Section 402 of the Act (29 U.S.C. § 482).

The Secretary charges that the Union violated Section 401(e) of the Act in that its by-laws made eligible for nomination as officers only those members who were then members of the Assembly or of the Executive Board or who had served in the past as members of the Assembly or of the Executive Board or of the former Shop Delegates Council. The Secretary contends that this qualification is not "reasonable" under Section 401(e) of the Act.

It is undisputed that the Union is a "labor organization" subject to Section 401 of the Act, in that it is engaged in an industry affecting commerce (Act § 3(i), 29 U.S.C. § 402(i)). It is also undisputed that members of the Union, having invoked available internal union remedies without final decision, etc., properly filed a complaint with the Secretary and that the Secretary investigated, found probable cause to believe that a violation had occurred, etc., and timely brought this action.

The Court has jurisdiction under Section 402 of the Act.

If the Union did violate the Act as charged and if this violation "may have affected the outcome" of the election, the Court must then declare the election void and direct a new election (29 U.S.C. § 482(c)).

The prior office holding qualification of the by-laws is found not to have been "reasonable" and its enforcement in the 1965 election is found to have been a violation of the Act.

It is not found that this violation "may have affected the outcome" of the election.

The 1965 election of officers cannot be declared void, therefore, but the Secretary may properly be given relief in respect of future such elections.

## I

### A. Description of the Union; Elections Before That in 1965

The Union began about 1938 with a successful effort to organize workers in the hotels and clubs in New York City; it was in an organizational period until about 1946.

The Union has been at all times affiliated with the Hotel and Restaurant Employees and Bartenders International Union, A.F.L.–C.I.O. (the "Hotel, etc. International"). It is the largest of the locals affiliated with the Hotel, etc. International.

From the early days of the Union to 1951, its "highest legislative body" was the "Shop Delegates Council". This was made up (a) of delegates elected from each department of each hotel and club, (b) of members of "department boards" and (c) of the general officers. In order to be eligible as a candidate for delegate to the Shop Delegates Council, a person must have been employed at the hotel or club for at least six months and must have been a member of the Union for at least one year.

After a crisis in the affairs of the Union, an election of delegates to a convention was held in May 1951 and an election of officers was held in June 1951. There were rival slates in both elections. Voting machines were used; as has been the practice in all later elections of the Union. The candidates for delegates of the United Union Organization, running on Row A (the top row) were elected by a wide margin. The candidates for officers of the Administration Ticket, running on Row A, were elected by a vote of about 7,300 to about 3,300 for the nearest opposition slate.

It has been the practice in all Local 6 elections that the administration slate is given the Row A position on the voting machines.

New by-laws were adopted at a special convention held in September 1951, and from that time down through the 1965 election in suit, the structure of the Union has been substantially the same.

By force of the 1951 by-laws, the Shop Delegates Council was abolished and the "Assembly" was set up as the "highest legislative body" in its place. The method of electing delegates to the Assembly was changed from that employed for the Shop Delegates Council. Doubtless these changes were to reduce the governing body to a less numerous and thus to a more efficient group.

The Union is organized by departments and by districts.

The departments are made up of members in each separate craft or broad category of work, except that all club employees are in the club department regardless of the work they do. There are five departments of hotel employees: Banquet, Bar, Dining Room, Housekeeping and Kitchen.

The districts for hotel employees are geographical areas determined by the most effective and convenient grouping of hotels for administrative purposes. There are six numbered districts for hotel employees. All club employees are in a single district.

The basic element in the Union is the unit or shop in the hotel or club where the members of a particular craft work. Each dining room or kitchen, for example, is a separate unit. Each unit elects a "department delegate" who cooperates with officers of the Union in the handling of grievances and other matters affecting members in his unit. The term "department delegate" is simply another name for shop steward. The department delegates in a district, together with the district officers, make up the District Council.

The organizational novelty of Local 6 is that, while each craft has its own unique traditions, interests and problems, Local 6 includes several different crafts and negotiates with employers for them all. By means of by-laws and otherwise, however, care is taken that each craft (department) in Local 6 has proportional representation in the Assembly and in

other Union activities. Care is similarly taken that the employees in any one hotel do not acquire a dominant influence.

Each district has a vice-president and from one to four business agents. These are paid and full time officers and are elected by the members in the district (before March 1959 voting had been by departments).

There are four general officers of the Union: President, Secretary-Treasurer, General Organizer, and Recording Secretary. The general officers are paid, full time officers and are elected by all members in all districts.

The delegates to the Assembly are elected by districts but within a district delegates may be elected from "election districts" established by the Assembly (before March 1959 voting had been by departments). In general, one delegate is elected for each 75 members in the district; there are by-law provisions to see that delegates are elected from the various departments in proportion to department membership and not too many from any one hotel. The Assembly meets at least quarterly and each year must meet for a full day. The general officers, the vice-presidents, and the business agents are automatically members of the Assembly.

There is an Executive Board (which meets monthly) made up of the principal officers and of members elected by the Assembly on the basis of one Executive Board member from each department for each 500 members of that department.

The term of office of officers and members of the Assembly was two years until a revision of the by-laws in March 1959; since March 1959, the term has been three years.

From September 1951 until at least October 15, 1963, the by-laws of the Union required that a candidate for office must have been a member in good standing for two years and in addition "must be a member of either the Assembly or the Executive Board, or else, at some time in the past, have served at least one term on either the Executive Board, the Assembly, or the old Shop Delegates Council".

It is suggested for the Union that at a meeting of the Assembly on October 15, 1963, the quoted by-law provision was amended so as to change the word "term" to the word "year". The evidence is not convincing that such amendment was in fact adopted. The difference between "term" and "year" is not significant for this decision, however, and it will be assumed that before the 1965 election the word "term" had been changed to "year".

While this prior office qualification had to be satisfied by candidates for Union office at an *election,* it was not applicable to *appointed* officers. If an office becomes vacant, a successor can be appointed by the general officers subject to approval by the Executive Board and the Assembly. Moreover, the Assembly may appoint business agents (who are paid officers) additional to those elected. Several members who had never held office in the Union were in fact appointed as business agents.

Candidates for delegate to the Assembly must have been members in good standing in the Union for one year before nomination.

The 1951 by-laws provided that an election of officers should take place in May 1954 and every two years thereafter.

An election of officers, members of the Executive Board and members of Department Committees took place on May 19, 1954. The incumbent administration ran a full slate for 4 general offices, 23 department offices, 59 members of the Executive Board, and 70 members of the Department Committees. There were no opposition nominees for general offices and but 10 opposition nominees for 9 of the 23 department offices. There were 19 opposition nominees for 16 of the 59 places as members of the Executive Board. There were 11 opposition nominees for 11 of the 70 places as members of Department Committees. The administration slate won all contests by sub-

stantial margins except in one department where the margin was smaller. The vote in the several contests for department offices was as follows:

| Administration Nominees (elected) | | | | | Opposition Nominees |
|---|---|---|---|---|---|
| (elected) | 1981 | | | | 136 |
| | | * | * | * | |
| (elected) | 2315 | | | | 712 |
| | | * | * | * | |
| (elected) | 2276 | | | | 674 |
| (elected) | 2270 | | | | 691 |
| (elected) | 2238 | | | | 693 |
| (elected) | 2216 | | | | 672 |
| | | | | | 189 |
| | | * | * | * | |
| (elected) | 4541 | | | | 53 |
| (elected) | 4565 | | | | |
| (elected) | 4523 | | | | |
| (elected) | 4534 | | | | |
| | | * | * | * | |
| (elected) | 666 | | | | 567 |
| | | * | * | * | |
| (elected) | 684 | | | | 522 |

There was an election of officers, members of the Executive Board, and members of Department Committees, called to be held on May 16, 1956. The administration nominated a full slate for 4 general offices, 23 department offices, 59 members of the Executive Board, and 60 members of the Department Committees. There were no opposition nominees for any offices. In one department, there were 4 opposition nominees for 3 places as members of the Executive Board and 7 opposition nominees for 7 of the 10 places as members of the Department Committee. There was no voting in 1956 except in the one department where there were some opposition nominees for the Executive Board and the Department Committee. In that department, the full administration slate for the department appeared on the voting machine even though there was no contest for any of the offices. The administration slate won by a substantial margin. The administration nominees in all departments were declared elected.

For some reason not appearing in the record, there was no election of officers in 1958, the end of the two year term. Presumably the incumbent officers continued to act.

At some time before March 1959, the by-laws were amended to provide that there should be an election of officers and members of the Assembly in May 1959 and every third year thereafter, and that the terms of office of the officers and members of Assembly should be three years. It was also provided that voting should be by districts rather than by departments. There were four geographical districts, a club district and two departments treated as districts.

There was an election on May 21, 1959 of officers and of delegates to the Assembly, all for a three year term. The administration nominated a full slate for 4 general offices, 21 district offices, and 408 delegates to the Assembly. There were no opposition nominees for general offices and but 4 opposition nominees for 3 of the 21 dis-

trict offices. There were 15 opposition nominees for 15 of the 408 places as delegates to the Assembly. The adminis- tration won all contests by substantial margins. The vote in the several con- tests for district offices was as follows:

| Administration Nominees | | Opposition Nominees |
|---|---|---|
| (elected) | 1865 | 116 |
| (elected) | 1862 | |
| | * * * | |
| (elected) | 778 | 205 |
| | * * * | |
| (elected) | 757 | 209 |
| | | 47 |

———◆———

There was an election on May 23, 1962 of officers and of delegates to the Assembly, all for a three year term. The administration nominated a full slate for 4 general offices, 25 district offices, and 399 delegates to the Assembly. There were no opposition nominees for any of the offices. There were 6 opposition nominees for 6 of the 399 places as delegates to the Assembly. The entire administration slate was elected; the opposition nominees for the Assembly were defeated by wide margins.

The by-laws were further amended on October 15, 1963. As a result, the Union was divided into geographical districts and the Club District; each district was to have its own offices: a vice-president and one or more business agents; no officers were to be elected by any department. It was provided that the next election should be in May 1965.

The membership in the Union since 1951 has remained at about the same number. The exact figures, with number of votes cast in the elections (including the 1965 election in suit), are as follows:

| Election Year | Membership | Votes Cast |
|---|---|---|
| 1951 | 26,630 | 12,705 |
| 1953 | 25,678 | 14,618 |
| 1959 | 26,974 | 11,214 |
| 1962 | 26,340 | 7,131 |
| 1965 | 27,354 | 11,254 |

While the total number of members in the Union is thus a static figure, there seems to be a high turnover of individual members. This is shown by the fact that from August 1, 1963 to July 31, 1965 there were 5,737 new members joining the Union, or an average of about 240 new members each month. Applying this figure to the 36 months between the May 1962 election and the May 1965 election, it would appear that 8,640 new members joined the Union in that period, or roughly a third of the membership. It is indicated that there is a turnover of upwards of 10% of the Union membership each year.

The exact number of Union members who were eligible to run for Union office in May 1965 cannot be determined, principally because there are few records of the old Shop Delegates Council which, as already noted, was abolished in 1951. It was impossible for the Union to apply its eligibility rule with accuracy because there was no way to verify whether a particular candidate had been a member of the Shop Delegates Council. There is some evidence that if an identification card or some similar certificate in respect of the Shop Delegates Council was produced by a candidate, this was accepted to establish eligibility. The Union produced at trial a list of names taken from its records which showed that at least 1725 members were eligible to run for office in the May 1965 election. Of these 1725 members, 1182 were eligible because they had been members of the Shop Delegates Council before 1951; the re-

maining 543 were eligible because they had been members of the Assembly at some time since 1951.

In practice it was not possible to be elected to the Assembly except with the blessing of the Administration Party conferred by selection to run for the Assembly on Row A. This was doubtless in large part because there was never a full slate of opposing candidates for the Assembly. The candidates to run on Row A for the Assembly were selected by the incumbent group of officers and were put in nomination after caucuses of invited members, attended by officers. It was only natural that candidates selected to run on Row A for the Assembly would be supporters of the administration. All candidates on Row A were pledged to support each other. Dissidents could not be elected to the Assembly.

B. The Election of May 19, 1965

An election was called to be held on May 19, 1965. At this election, there were to be elected from the Union as a whole four general officers and 10 delegates to the Convention of the International. In the 7 districts, there were to be elected a total of 27 district officers (7 vice-presidents and 20 business agents) and 372 delegates to the Assembly.

In anticipation of the 1965 election, an opposition group was organized calling itself the "Membership Party".

The Assembly met on April 6 for nominations for the 4 general offices and for 10 delegates to the International Convention. Nominations were permitted to be made by any member. Two full rival slates were nominated for these 14 positions, one being the administration slate (made up principally of those who were already serving as paid officers) and the other that of the opposition Membership Party.

There were meetings on April 13 in each district for nominations for the 27 district offices and for the 372 delegates to the Assembly. A full slate was nominated for the administration to run for the 27 district offices and for the 372 places for delegates to the Assembly. In all districts except the Club District, there were opposition candidates nominated for vice-president; in five districts, there were opposition candidates nominated for business agent, but not for all the business agent positions to be elected. For the 27 district offices to be elected, there were 14 opposition nominees for 16 offices (two of the Membership Party nominees were each nominated for two separate offices). Of the 14 opposition nominees for district office, one was an independent not affiliated with the Membership Party. For the 372 Assembly delegates to be elected, there were 5 opposition nominees, 2 of the Membership Party and 3 running as independents.

Elections in the Union are conducted under rules and regulations established by an "Election and Objections Committee" designated by the Assembly. The Committee also rules on the eligibility of candidates nominated to run for office or for delegate to the Assembly.

The Committee ruled ineligible two of the Membership Party nominees for the four general offices. The nominee for Secretary-Treasurer was ruled ineligible because he had not held prior office. The nominee for Recording Secretary was ruled ineligible because he had not been a member of the Union for the required period of two years.

The Committee ruled ineligible two of the Membership Party nominees for delegate to the International Convention, apparently because they had not been members of the Hotel, etc. International in continuous good standing during the period since April 18, 1964. Delegates to such Convention must have been members of the Hotel, etc. International for at least two years and of the local union at least sixty days before the Convention. The Convention for which delegates were to be elected by Local 6 on May 19, 1965 was to meet on April 18, 1966.

The Committee ruled ineligible, because they had not held prior office, five Membership Party nominees for

vice-president of districts (one was a nominee for vice-president in two districts) and three Membership Party nominees for business agents of districts (one was also a nominee for vice-president.) Eight persons were thus ruled ineligible for district office because they had not held prior office.

The Committee ruled ineligible, because they lacked the required period of membership, three Membership Party nominees, one for vice-president and two for business agent.

No nominees for the Assembly, whether of the Membership Party or independent, were ruled ineligible.

There is no suggestion that the Committee incorrectly applied the qualification provisions of the by-laws to the facts as they existed in respect of the opposition nominees.

The 1965 election, in accord with settled practice, was conducted with voting machines. The nominees for the four general offices and for the ten delegates to the International Convention appeared on the machines in all the districts. The full administration slate was on Row A. The two nominees of the Membership Party for general office (President and General Organizer) and its eight nominees for the ten delegates to the International Convention were on Row B, just below Row A.

There were thus two blank spaces on Row B in the four columns for general offices (no Membership Party nominees for Secretary-Treasurer and Recording Secretary) and two blank spaces in the ten columns for delegates to the International Convention. Had the prior office by-law qualification not been in force, there would have been a Membership party nominee for Secretary-Treasurer on Row B in all districts.

In each district, the nominees for district offices and for the Assembly appeared on the machines in an extension to the right of the rows in which were the nominees for general offices; then in a further extension of the row to the right appeared the nominees for delegates to the International Convention. The full administration slate for the district was on Row A.

According to normal voting machine procedure, it was possible to pull down one lever to vote for all the nominees of a particular slate on one row.

In four districts (1, 3, 5, 6), there were no opposition nominees on the voting machines for the 14 district offices or for the 195 Assembly delegates to be elected in those districts. Had the prior office by-law qualification not been in force, there would have been 6 Membership Party nominees on the voting machines for the 14 district offices to be elected in those districts.

In the Club District, there was one Membership Party nominee on the voting machines for Assembly delegate, there having been 24 delegates to be elected in the election district of that nominee. This Membership Party nominee appeared on Row B. Had the prior office by-law qualification not been in force, the situation in that district would have been the same.

In one district (2), there was one Membership Party nominee for one of the three business agents to be elected. This nominee appeared on Row B. There was also an independent opposition nominee for one of the three business agents to be elected and two independent nominees for two of the 29 Assembly delegates to be elected in their election district. The independent nominees appeared on a third row designated "Independent" and just below Row B. Had the prior office by-law qualification not been in force, there would have been two Membership Party nominees for two of the four district offices to be elected.

In the remaining district (4), there was one Membership Party nominee for one of the three business agents to be elected and one Membership Party nominee for one of 28 Assembly delegates to be elected. These nominees appeared on Row B. There was one independent opposition nominee for one of the 28 Assembly delegates. The independent

nominee appeared on a third row designated "Independent" and just below Row B. Had the prior office by-law qualification not been in force, there would have been two Membership Party nominees for 2 of the 4 district offices to be elected (two Membership Party nominees were each nominated for two different offices; it is assumed that they could not have properly run for both, even if eligible for either).

In the May 19, 1965 election, 11,254 members cast votes (not all voted for every position to be filled) out of 27,-354 members eligible to vote.

So far as appears from this record, the voting was fairly and honestly conducted and the votes were accurately counted.

The result of the voting was the election of all Row A administration slate candidates.

The vote in the two contests for general offices was as follows:

| Administration Nominees | | Membership Party Nominees | |
|---|---|---|---|
| (elected) | 9,314 | 1,347 | |
| (elected) | 9,216 | 1,299 | |

The lowest vote cast for an administration nominee for delegate to the International Convention was 8,615; the highest vote cast for a Membership Party nominee was 1,154.

Two nominees for Union office of the Membership Party who were ruled ineligible because they had not held prior office were ruled eligible to run for delegate to the International Convention and did appear as candidates for delegate on the voting machines in all districts. They received 1,151 and 1,145 votes, respectively; as noted above, the lowest vote for an administration nominee was 8,615.

The vote in the contests for business agents, where three were to be elected in each of two districts, was as follows:

| Administration Nominees | | Membership Party Nominees | | Independent Nominees | |
|---|---|---|---|---|---|
| (elected) | 1,188 | 333 | | 70 | |
| (elected) | 1,206 | | | | |
| (elected) | 1,184 | | | | |
| | | * * * | | | |
| (elected) | 1,924 | 262 | | | |
| (elected) | 1,942 | | | | |
| (elected) | 1,903 | | | | |

In the contest for one place as Assembly delegate in the Club District, the lowest vote cast for an administration nominee for Assembly delegate was 571; the vote for the Membership Party nominee was 58.

In District 2, the lowest vote for the 29 administration nominees for Assembly delegate was 568; the two independent nominees received 40 and 41 votes respectively.

In District 4, the lowest vote for the 28 administration nominees for Assembly delegate was 540; the Membership Party nominee received 71 votes and the independent nominee 14.

## C. Epilogue

The officers and members of the Assembly elected on May 19, 1965 have been acting as such since that date and have already served almost two years of their three year term.

It appears that during the pendency of this action and in December 1966, the by-laws of the Union were substantially changed in respect of the prior office qualification. As then amended, the qualification to run for Union office is that the candidate "must have served as a member of either the Assembly or the Executive Board or he must have been a department delegate, or in the alternative, he must have been a member of the Union for five (5) years".

## II

Evidence was introduced for the Secretary to show to what extent other unions in the country required prior office holding to be eligible for union office. This kind of evidence has been admitted and considered in determining whether particular qualifications were "reasonable" under Section 401(e) of the Act. Wirtz v. Local Unions No. 406, etc., 254 F. Supp. 962, 965 (E.D.La.1966); Wirtz v. Local 30, etc., 242 F.Supp. 631 (S.D.N.Y. 1965), remanded on other grounds, 366 F.2d 438 (2d Cir. 1966); Goldberg v. Amarillo General Drivers, etc., 214 F. Supp. 74, 77–78 (N.D.Tex.1963).

There were 72 major national and international unions, that is, unions having more than 40,000 members. Of these, only one required prior office holding as a qualification for candidacy for local union office. The Hotel, etc. International, with which Local 6 is affiliated, is not that one and has no such requirement.

There were 23 national and international unions which have between 20,000 and 40,000 members. None of these required prior office holding as a qualification for candidacy for national or international union office. The Secretary argues that this is appropriate for consideration because the membership of Local 6 is about mid-way between 20,000 and 40,000; for Local 6, it is pointed out that

Local 6 is not a national union and that the national union with which it is affiliated has a membership of 444,000.

There were 485 local unions affiliated with the Hotel, etc. International. The average number of members of the locals was 899. There were 125 locals having more than 900 members, including, of course, Local 6. Of these 125 locals, 93 (or about 75%) had no requirement of prior office holding as a qualification for candidacy for local union office.

There were 66 local unions of all kinds which had total receipts in 1964 of more than one million dollars; Local 6 in that year had receipts of more than two million dollars. Of these 66 local unions, only seven required prior office holding as a qualification for candidacy for local union office. Local 6 was one of the seven, and the other six were all affiliated with the one national or international union which requires prior office holding as a qualification for candidacy for local union office.

## III

■ The prior office eligibility requirement of Local 6 was not "reasonable" within the meaning of Section 401 (e) but was contrary to the basic purposes of the Act. It has been noted that the requirement dates from at least 1951; the Act did not become effective until 1959.

■■ One of the chief aims of the Act was to secure "free and democratic union elections" just as in elections in the community at large. S.Rep.No.187, 86th Cong., 1st Sess., 20, also 5–6 (1959), U.S.Code Congressional and Administrative News, p. 2318. Congress therefore provided specifically and affirmatively that "every member in good standing shall be eligible to be a candidate" and the only relevant exception was for "reasonable qualifications". The burden of showing that a qualification is "reasonable" is a very heavy one.

■ Any requirement of prior office holding to be eligible for union office would be unreasonable. The only justification for such a requirement is, as

here urged for Local 6, that the magnitude and complexity of union problems requires a certain minimum of experience in union affairs. But this is on the premise that the membership at large cannot be trusted properly to evaluate union experience in casting election ballots. The philosophy of a free democratic society, expressed in the Act, does not tolerate such a premise. The philosophy adopted by Congress in the Act is well expressed in a motto used by a newspaper and said to have been inspired by, or translated from, Dante (Divine Comedy, Purgatory, canto XXII, lines 67–69): "Give light and the people will find their own way". The members of a union must have a free choice to give such weight to experience, inexperience, or to other factors as they see fit. Such is the choice when voting for President and Vice-President of the United States. Candidates for those high offices are not required to have any particular prior experience. The voters weigh the prior experience of the candidates, or lack thereof, in making their choice.

The evidence shows that over 90% of large local unions of all kinds have no prior office requirement and that about 75% of the larger locals which are affiliated, like Local 6, with the Hotel, etc. International have no such requirement.

In any event, the particular by-law requirement of Local 6 was not in its context "reasonable".

Accepting the Union figures, the effect in 1965 of the prior office qualification was to make ineligible for office about 93% of the membership. While 1725 members (or about 7% of the total) were eligible, 1182 of this number (or nearly 70% of the eligibles) satisfied the prior office requirement by service on the Shop Delegates Council, a body which was abolished in 1951, fourteen years before the election. A former member of the Shop Delegates Council who had not held office for fourteen years would thus be eligible whereas an active department delegate for ten years would not be eligible.

Since 1951 the only way new members could become eligible for office was to win election to the Assembly. But in this period the only candidates which won such election were those who ran on Row A, the administration ticket. The only way to run on Row A was to be selected by the administration. Thus, dissidents could not become eligible to be opposing candidates for office and effective opposition was thus sharply curtailed.

Finally, the need for prior office experience is not shown. In this connection, it is significant that an officer may be *appointed* who has no prior office experience and who thus does not satisfy the eligibility requirement for election to that office. But once such an officer is appointed, he automatically becomes a member of the Assembly and immediately become eligible to run thereafter for any union office. This enables the incumbent group to qualify members for elective office by a procedure not available to dissidents.

Any requirement of prior office holding to run for union office is bound to favor the incumbents to the prejudice of wholly free and open elections which it was the purpose of Congress to encourage.

## IV

■ It cannot be found that the violation of Section 401(e) "may have affected the outcome" of the 1965 election.

■ Decision of this issue is governed by the teaching of Wirtz v. Local Unions 410, etc., 366 F.2d 438, 442–443 (2d Cir. 1966). It may be possible to read that opinion (at 443) as declaring that whenever there has been an "exclusion of willing candidates from the ballots", this is sufficient without more to compel a finding that the exclusion "may have affected the outcome". In an earlier decision by a District Court, such seems to have been assumed. Wirtz v. Local Unions No. 406, etc., 254 F.Supp. 982, 966–967 (E.D.La. 1966). Our Court of Appeals stated in its opinion, however, that the Secretary must show a "reasonable probability" that the election may have been affected

and that there is a "meaningful relation" between the violation and the election outcome. It seems, therefore, that a violation by disqualification of candidates does not automatically require a finding that the outcome may have been affected.

Two elections were before our Court of Appeals, each in a different local union. Prior to one election, eleven opposition candidates were disqualfied; after this, the election was uncontested, 216 members then voting out of a total of almost 600 members. One of the disqualified candidates is referred to by the Court of Appeals as a "proven vote-getter" who had won in an earlier election. In the other election, two opposition candidates were disqualified; after this, the election was uncontested, 607 members then voting out of a total of 3,000 members.

By contrast, while the violation in the case at bar caused the disqualification of nine candidates, there was nevertheless a contested election. In this contested election, there was an opposing candidate for the highest union office (President) and an opposing candidate for General Organizer, the second or third most important office in the union. There were eight opposing candidates for Convention Delegate, running in all districts, and three opposing candidates for district offices. Two of the candidates disqualified for general offices (only one of whom was disqualified for lack of prior office experience) were ruled eligible to run, and did run, in all districts for Convention Delegate. The opposing candidates established a campaign headquarters and conducted an apparently vigorous campaign, with distribution of leaflets and weekly caucuses and election forums. There is nothing to show that any disqualified candidate was a "proven vote-getter" because none of those disqualified had ever run for any office or for the Assembly. In the contested election of 1965, there were 11,254 votes cast out of a total membership of 27,354; this is to be compared with the vote in the last uncontested election of 1962 when 7,131 votes were cast out of a total membership of 26,340.

Consideration has been given not merely to the effect of the by-law on those disqualified but to its possible effect in discouraging others from coming forward as opposing candidates. Nonetheless the heavy vote in favor of the administration candidates is convincing that the existence and enforcement of the by-law could not have affected the outcome of the election.

The evidence satisfies me that the primary reason for the heavy vote in favor of the administration was the lack of any real grievance or issue against the union management. The platform of the opposition Membership Party did not charge any abuses or misconduct or even any inefficiency; there was no attempt to state any specific complaints; there was no dramatic or important issue to rouse the membership against the incumbents. The appeal of the opposition was in substance that it could do the same job better.

The evidence also shows an important further reason for the election outcome. The administration ran candidates for all 372 places as delegates to the Assembly; against them were only 5 opposing candidates and of these only 2 were of the Membership Party. The history of earlier elections shows that when there are only a few candidates opposing a full slate for the Assembly, the opposing candidates are never elected. There is no suggestion that the qualification for Assembly candidacy (one year's membership) was unreasonable. Any substantial rank and file dissatisfaction would have produced many more opposing candidates for the Assembly than the 5 who actually ran. The presence in all districts of a full slate of Assembly delegates, virtually unopposed, was itself so great an advantage to the administration as to insure the outcome. The vote of 372 Row A candidates themselves, with their fellow workers and friends in their respective shops, was a powerful factor and, taken with the ability of members to vote the only full ticket by pulling down one lever of the voting machine, must have been overwhelming.

## V

The 1965 election cannot be declared void and a new election directed. However, Local 6 ought not to be left free to enforce in future elections—such as that due to be held in May 1968—a qualification which is not "reasonable". The Secretary ought not be put to the necessity of bringing a second action.

■ Rather than dismissing the complaint, therefore, it seems only right to enjoin Local 6 from enforcing in future elections any prior office holding qualification.

True, the Act does not expressly authorize such relief; neither does it expressly deny authority to grant it. The legislative history indicates that Congess never considered the situation here presented; thus there is no legislative history relevant to the question of granting the suggested relief.

In the Local Unions 410, etc. opinion, our Court of Appeals said (366 F.2d at 442):

"And because Title IV does not permit the Secretary to seek either to enjoin future elections, or to declare a given candidacy requirement unlawful absent a valid complaint and an investigation of its application to a specific election, cf. Calhoon v. Harvey, supra, we conclude that we have no power to afford the Secretary relief and therefore that these cases are moot."

But the situation there was that a new election had *already* taken place when the Court of Appeals spoke; action had already become moot. In the case at bar, the officers still hold office under the 1965 election against which the action was directed. The action here is not moot. Moreover, unlike Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed. 2d 190 (1964), the Secretary (not individual members) is properly before this Court.

If the 1965 election cannot be declared void under the Act, despite a violation, why should not the Secretary at least be given relief against a similar violation in the future? This would seem entirely consistent with the purposes and objects of the Act. The Secretary in his complaint prays in traditional form for "such other relief as may be appropriate".

■ Congress by the Act has given jurisdiction to this Court as a court of equity. Such jurisdiction means that the Court can grant whatever relief is appropriate to the purposes and objects of the Act, whether expressly authorized in the Act or not. United States v. Republic Steel Corp., 362 U.S. 482, 492, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960); Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 290–292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); Porter v. Warner Holding Co., 328 U.S. 395, 397–398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). Citing these decisions, a commentator has suggested with reference to the Act:

"The fact that one type of equitable enforcement remedy may have been expressly provided by Congress in a regulatory statute should not be a bar to a court's utilization of additional equitable remedies which will achieve the legislative purpose." Beaird, Union Officer Election Provisions of the Labor-Management Reporting and Disclosure Act of 1959, 51 Va.L.Rev. 1306, 1338 (1965).

Our Court of Appeals, citing with approval the Beaird article at the pages from which the above quotation is taken, appears to have concluded that appropriate equitable relief may be given in this type of action even if not expressly authorized in the Act. Wirtz v. Local Unions 545, etc., 366 F.2d 435, 436 (2d Cir. 1966).

■ The change made by Local 6 in its by-laws after the action was commenced is not sufficient to comply with the Act. The qualification by-law in effect at the May 1965 election required prior office holding and two years' membership in good standing. That by-law as later amended now requires prior office holding *or* membership in good standing for *five* years. Thus the amended prior office holding qualification has the effect of discriminating against those who have been members

for two years but have not held prior office. In a union with a large turnover and the regular entry of numerous new members, the amended qualification by-law is not "reasonable" under the Act. The Secretary is entitled to an injunction against the enforcement in any future election in Local 6 of any by-law requiring prior office holding as a qualification for office.

The foregoing contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

A judgment in accordance with the opinion may be submitted on notice.