W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

LOCAL 191, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.

Civ. No. 9776.

United States District Court
D. Connecticut.

Feb. 6, 1964.

George T. Avery, Dept. of Labor, Washington, D. C., Robert C. Zampano, U. S. Atty., Anthony G. Apicelli, Asst.

U. S. Atty., New Haven, Conn., for plaintiff.

Norman Zolot, Hamden, Conn., for defendant.

ANDERSON, Chief Judge.

FINDINGS OF FACT:

1. The defendant, Local 191 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, is a labor organization and collective bargaining agent for the employees of Spector Freight System, Incorporated.

2. George J. Kyer, is an employee of Spector Freight System, Incorporated (hereinafter referred to as Spector), and a member of Local 191.

3. The collective bargaining agreement in force between Local 191 and Spector, called the New England Freight Agreement, provided for the check-off and withholding of union dues as follows:

"Section 2. Check Off. The Employer agrees to deduct from the pay of all employees covered by this Agreement the dues, initiation fees and/or uniform assessments of the Local Union having jurisdiction over such employees and agrees to remit to said Local Union all such deductions prior to the end of the month for which the deduction is made. Where laws require written authorization by the employee, the same is to be furnished in the form required. No deduction shall be made which is prohibited by applicable law. Where an employee who is on check-off is not on the payroll during the week during which the deduction is to be made, the employees must make arrangements with the Union to pay such dues in advance."

George J. Kyer had received a copy of this agreement prior to December, 1961.

4. On August 18, 1961, Kyer executed a check-off authorization card which Local 191 required its members to execute. By it Kyer authorized Spector to withhold union dues from his

wages and pay those dues to Local 191. It also provided:

"* * * The monthly regular dues shall be deducted from my pay in the week preceding the first day of each following month and remitted on or before the first day of each month to Teamsters Union Local 191, 575 Broad Street, Bridgeport, Connecticut."

"* * * I agree that as a condition of my continued employment with you that I will maintain my good standing in the Union by the payment of the regular monthly dues so long as I continue to be employed by you."

This check-off authorization continued to be in full force to and including the time of trial.

5. The constitution of the International Brotherhood of Teamsters defines the rules of eligibility for office in its local affiliates. Article II, § 4(a) (1) requires that a union member to be eligible for office must have 24 months continuous good standing. Continuous good standing is defined as meaning compliance with Article X, § 5(c) of the same constitution, which provides:

"Section 5(c). All members paying dues to Local Unions must pay them on or before the last business day of the current month. Any member failing to pay his dues at such time shall not be in good standing for such month, but may restore such good standing for such month for the purpose of attending meetings, nominating, voting, and participating in affairs of the Local Union by the payment of his delinquent dues prior to said meeting. Payment of such dues after their due date shall not restore good standing status for such month or months in computing the continuous good standing status required by Article II, Section 4 of this Constitution as a condition of eligibility for office. * * *"

6. The actual system, however, for withholding dues from the wages of the employees, commonly known as dues check-off, in use at Spector's was as follows: On one payday per month Spector would withhold dues, $7 per month, from the wages of all its employees who were members of Local 191 and who had wages coming to them on that payday. The payday on which this was done was not always the same. Generally the check-off in one month was payment of dues for the following month, or in other words, dues were checked off one month in advance. Generally the check-offs were made by Spector towards the beginning of one month in order to forward the funds to the Union prior to the first of the following month.

7. Spector did not follow the instructions on the check-off authorization card signed by all employee-union members that the dues were to be deducted "in the week preceding the first day of the following month" because of the difficulty of doing that and forwarding the money to the Union at its Bridgeport office from Spector's office in Chicago.

8. When Local 191 received the check-off dues from Spector, Local 191 recorded the payment of each man's dues on each man's ledger card, maintained for that purpose at the Union office. When a member paid by cash or check, the entry was similarly made on his ledger card.

9. On December 8, 1961, Spector checked off $6 from the wages of Kyer, and on December 15, 1961, Spector made an additional check-off of $1 to reflect an increase in union dues from $6 to $7. These funds were transmitted to Local 191 and represented payment of union dues for January, 1962. On December 29, 1961, Kyer's employment was terminated with Spector. From December 29, 1961 until April 15, 1962, when Kyer was again employed by Spector, Kyer paid his dues himself directly to the Union in cash or by check.

10. On January 26, 1962, Kyer made a $7 cash payment for February, 1962, dues. This was recorded on his ledger card on January 26, 1962.

11. On February 24, 1962 Kyer made a cash payment of $7 for his March dues. This was recorded on his ledger card on March 1st.

12. On March 31, 1962, Kyer made a cash payment of $7 for his April dues; this was recorded on his ledger card on April 9, 1962.

13. Kyer returned to work for Spector on April 15, 1962. On April 19, 1962, Spector made a check-off of union dues for all union members who had wages coming to them on that date and transmitted those dues to the union, which recorded the payment of these dues on April 21, 1962. Since George Kyer had only started to work on the 15th, he had no wages coming to him on the payday on which the check-off was made and consequently no dues were checked off for him for the month of April. Kyer made no cash payment in the month of April.

14. On May 4th, Spector checked off dues of union members, including Kyer, and forwarded them to the Union in payment of June dues. This was recorded on the ledger cards on May 14, 1962. As far as Kyer is concerned this represented the payment of his May dues. Thus at this point Kyer was only current in the payment of his dues and was not one month in advance.

15. On June 6, 1962, another check-off was made, including the dues of George Kyer, and these dues payments were recorded on the ledger cards of the Union on June 25th. This was, for most union members, payment of July dues, but for Kyer it represented payment of his June dues.

16. During the first two weeks of July Kyer took a vacation without pay. Spector owed him wages for the last week in June and did not pay him these wages until he returned to work after the 15th of July. Spector made a check-off of union dues on July 6, but since Kyer had no pay coming to him on that payroll, no union dues were deducted from his pay for the month of July.

17. When Kyer returned to work on July 15, 1962, he received his paycheck dated July 3rd for wages due him from the last week in June. No other check-offs were made in July and Kyer made no cash payment in July. Therefore, as of July 31, 1962, Kyer had not paid nor had the employer checked off his dues for July.

18. When Kyer returned from his vacation on July 15th, he asked his shop steward, Fred Annunziato, if Annunziato had put his dues receipt in its usual place and Annunziato made a response to the effect that it was where it always was. Throughout the time that Kyer worked for Spector he was accustomed to examine his paycheck stubs to see if they represented generally the number of hours he had worked for that pay period and to see if various deductions had been made, including, inter alia, deductions for union dues.

19. Kyer in good faith thought his July dues had been paid.

20. On August 3rd, Spector checked off union dues, including those of Kyer; these were recorded on the ledger cards on August 23rd. This represented generally payment for August but in Kyer's case payment for July.

21. There was no check-off in September due to an oversight on the part of Spector.

22. On October 5th, 1962, Spector checked off the dues which it should have checked off in September and on October 12th Spector made an additional check-off for October.

23. The receipts of payment given to Kyer by the Union after each dues payment, whether by cash or by check-off, stated the month through which he had paid his dues. The receipts that Kyer received through March 31, 1962, indicated that he was paid up one month in advance. On May 14th Kyer received a receipt for that payment indicating that he was paid up through May. The next receipt in evidence is dated August 23rd and shows that Kyer was paid up through September. The following receipt dated October 15th stated that Kyer was paid up through October, 1962. Both these receipts and the ledger card maintained

in the Union office, showing Kyer's dues payments, were erroneous. As Kyer made no payment and had no check-off during July, and, since prior to July he was only current and not paid up one month in advance, he became in fact one month behind as of July 31, 1962.

24. This error was discovered by Local 191 sometime between October 15th and October 23rd, 1962. On October 23rd Kyer received a receipt for the check-off of October 12th which indicated that Kyer was only paid up through September and on which was written in pen and ink "2 mo behind". The secretary of Local 191, Miss Elsie Lucas, sometime between October 15th and October 23rd changed the entries on Kyer's ledger card as follows: the August 23rd check-off represented July dues instead of September dues, the October 14th check-off represented August dues instead of October dues, and the October 23rd check-off represented September dues instead of October dues.

25. After receiving the receipt dated October 23rd upon which Fred Annunziato, Kyer's shop steward, had written "2 mo behind", Kyer and Annunziato met in a Howard Johnson's Restaurant on the Pennsylvania Turnpike. They discussed the alleged dues default on Kyer's part and Annunziato told Kyer that the payment of two months dues would bring him up with the rest of the employees but that Kyer was only really one month behind. Annunziato was making reference to the fact that most other employees are one month ahead. Kyer then gave Annunziato $7 which Annunziato turned in to the Union on November 5, 1962, and which was credited on Kyer's ledger card as payment of his October dues. Kyer made an additional payment of $7 in cash on November 8th which was credited as payment of his November dues. Therefore on November 11, 1962, the date of the nomination, Kyer was current in his union dues payments.

26. Kyer was nominated for the office of Secretary-Treasurer of Local 191 at a union meeting on November 11, 1962. Fred J. Roberto, the incumbent Secretary-Treasurer, was nominated to run for re-election to the same office.

27. On November 17, 1962, a committee headed by John Pisano, a member of the executive committee of Teamster's Joint Council 84, which had a kind of supervisory jurisdiction over all Teamster locals in Connecticut, met to review the eligibility of the nominees. Fred J. Roberto pointed out to Pisano that Kyer's dues for July, 1962, were paid in August, 1962. Pisano thereupon recommended to Roberto that Kyer be disqualified from the nomination. Roberto thereupon disqualified Kyer as a nominee with the result that Roberto ran unopposed for the office of Secretary-Treasurer, the highest office in the Local 191. The reason for Kyer's disqualification was solely because of the delayed payment of July, 1962, dues.

28. Barker Keith is also a member of defendant Local 191 and was nominated for office at the meeting held on November 11, 1962. The Union ledger cards indicate that Keith's August, 1962, dues were paid on September 1, 1962, in cash. Keith gave the cash payment of his August dues to his shop steward with instructions to take the cash payment to the union office and pay his dues. There is no evidence, however, that Keith's dues were actually paid to the union at its office on any date other than September 1, 1962. At the meeting held on November 11, 1962, at which Pisano reviewed the eligibility of the nominees, Pisano did not question Keith's eligibility and the facts concerning Keith's payment of the dues to his shop steward were not called to his attention by Roberto or anyone else. Pisano in his review of nominees' eligibility relied only on the union ledger cards showing the members' dues payments record. If Pisano had known of Keith's dues payments record, he would have recommended that Keith be disqualified on the same grounds on which he recommended Kyer's disqualification.

*Conclusions of Law:*

1. The court has jurisdiction of the subject matter and the parties.

2. The disqualification by the defendant, Local 191 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, of its member George J. Kyer as a candidate for the office of Secretary-Treasurer in the Local's election of December 15, 1962 was in violation of the provisions of Title 29 U.S.C. § 481(e).

3. The defendant is required to conduct a new election for the office of Secretary-Treasurer.

*Discussion:*

The defendant Union declared George J. Kyer ineligible to run for the office of Secretary-Treasurer of the Local 191 in its election of December 15, 1962 because it found he was late in paying his July, 1962, dues, which, under Article X, § 5(c) of the Constitution of the International Brotherhood of Teamsters, Kyer was required to pay on or before July 31, 1962. Even though he had paid-up all of his past dues before the election of December 15, 1962, that same section of defendant's constitution provided in effect that two years "good standing" for the purpose of qualifying as a candidate for union office cannot be restored by a late payment of dues.

The applicability of this section is, however, limited by statute, Title 29 U.S.C. § 481(e), the pertinent part of which says:

> " * * * No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. * * * "

The issue in this case is whether or not the quoted provision of Title 29 U.S.C. § 481(e), has any application to the facts of this case. The plaintiff argues that it does and the defendant argues that it does not.

The parties have agreed that, as to the question of Kyer's eligibility, internal union remedies have been exhausted in compliance with Title 29 U. S.C. § 482.

The Union's position is that Kyer was not on the payroll during the first two weeks of July, because he had elected to be away on vacation without pay. The employer made its check-off of dues on July 6th and, of course, checked-off no dues for Kyer because he wasn't on the payroll for that week. Kyer returned to work and to the payroll July 16th and continued on the payroll through the rest of July and the ensuing months. Under these circumstances it would appear, as the defendant asserts, that, inasmuch as Kyer missed having his dues paid via the check-off, it was up to him, on his own, to pay his dues in advance directly to the Union (collective bargaining agreement, § 2). This would undoubtedly be so if July 6, 1962 was the payday of the week during which the check-off deduction was "to be made" because § 2 of the collective bargaining agreement between the defendant and the employer, Spector, so provided. But the week of July 6, 1962 was *not* the week in which the check-off of dues was "to be made". The Union had arranged with the employer to check-off dues on the payday in the last week of the month and the Union required each employee, including Kyer, to sign an authorization to the employer to check-off, and pay the dues to the Union, out of the wages coming to him on the payday of the *last week* of the month. No authority was given the employer with or without consent of the Union to vary this. In fact, because of difficulty in processing the payroll and remitting the checked-off dues to the Union by the first day of the next month, the employer embarked on a practice of checking-off the dues in one of the earlier weeks of the month, varying it from month to month to suit its convenience. The Union did nothing about it. If the employer and the Union had adhered to the provisions of the written authorization, which was the only source of authority they had to check-off and receive dues out of Kyer's wages, Kyer's July dues would have been paid.

Kyer's advance dues payments began to get behind, and thereafter became only current payments, with May dues which, to be in advance, should have been paid in the last week of April. Actually, Kyer had wages coming to him for the paydays of the last weeks of April, May, June and July, and if the employer had checked-off his dues and paid them to the Union in the only way it was empowered to do, no question would ever have been raised as to Kyer's July dues. To say, therefore, that a union member loses the protection of Title 29 U.S.C. § 481(e) because the employer, with the tacit consent of the Union, makes the check-off in any week which suits its fancy other than the one in which it is authorized to do so, and thereby loses so valuable a right as his eligibility to run for union office would be a mockery of just and fair procedure.

■ The defendant Union argues that Kyer knew or reasonably ought to have known that dues had not actually been checked-off for him in payment of his July dues. But whether Kyer did or did not makes no difference. As long as an employee had wages coming to him on the payday of the last week of the month sufficient to take care of his dues check-off, the employer had a duty to check-off the dues on that authorized payday and no other; and the Union had a duty to its members to see that this was done. Here the defendant Union acquiesced in a check-off practice completely and continuously at variance with the formal check-off agreement and it is the Union which is estopped from raising the question of Kyer's non-payment of July dues. It is not Kyer who is estopped simply because he may have had at hand the means of finding out that his July dues were not paid in time. Where the check-off system is used and specific authority is given by the employees for its exercise at a particular time with payment of the dues directly to the union the burden of record keeping rests upon the employer and the union. It is not up to the individual employee

to take issue with the employer where the employer departs from the terms of the check-off system instituted under the terms of the collective bargaining agreement. It is only where the employee has not been employed and is not on the payroll for the payday on which the check-off is authorized to be made that he must see to it that he pays his dues himself in advance. Otherwise the rights of union member employees under Title 29 U.S.C. § 481(e) could be too easily lost or rendered nugatory or even destroyed through connivance or chicanery. So whimsical was the employer's compliance with the check-off provisions in this case that in September, 1962, it checked-off no dues at all; then in October it checked-off dues twice to make up for it. The Union's own records were so confused that Kyer's dues payment receipt for August showed he was paid up through September and his October 15, 1962 receipt showed that he was paid up through October. Thereafter errors were discovered; and he was told things about his status inconsistent with what the written receipts had said. To make certain that he was fully paid up he made the additional payments requested of him so that on any theory he owed no dues when the nominations were made on November 11, 1962 for the December 15th elections. He was improperly disqualified as a candidate for secretary-treasurer in that election.

The case of English v. Cunningham, 108 U.S.App.D.C. 365, 282 F.2d 848 (1960), relied on by the Union, and with a fact situation similar but significantly different from the case at bar, is not in point. The court there held that certain union requirements for eligibility as interpreted by the union president were not unreasonable and that there had been no delay or default on the part of the employer because "the dues were not withheld by the employer *at the usual time* since there were no wages then available from which to do so". (emphasis supplied) 282 F.2d at 850. In the present case dues were withheld *at*

*an improper time,* and this constitutes an employer default.

This result is in accord with Goldberg v. Amarillo General Drivers, etc., Local U. No. 577, 214 F.Supp. 74 (Tex. 1963), where dues were deducted neither in accordance with the collective bargaining agreement nor according to any regular pattern. The court held that this constituted employer default within the meaning of Title 29 U.S.C. § 481(e) and that employees disqualified because of alleged late payment of dues were protected by that statute. 214 F.Supp. at 79.

■ The planitiff also argues that the election must be set aside because of that part of Title 29 U.S.C. § 481(e) which provides that in elections every member shall be eligible subject to Title 29 U.S.C. § 504 and to reasonable qualifications uniformly imposed. The plaintiff asserts that one Barker Keith was found by the Union officials to be qualified to run for the office of president of the local although the records of the Union show that Keith's August dues were not paid until September 1st. The defendant's explanation of this was that Keith on August 31st had paid his dues to his shop steward who did not turn the money in at the Union office until the next day. This makes the breach appear to be a highly technical one but Pisano, the official passing upon qualifications of candidates, testified that he based his rulings upon what the office record showed and that if it had been brought to his attention that Keith was a day late on his August dues, the officials would have had to recommend the disqualification of Keith. The reason it was not brought to the officials' attention was because the Secretary-Treasurer, Fred S. Roberto, was the one who examined the records and disclosed his findings to Pisano who recommended disqualification to Roberto, the secretary-treasurer, who, in turn, had the authority to disqualify. It appears that the secretary-treasurer was so enthusiastic about finding something to disqualify Kyer as a rival candidate for the inquisi-

tor's own office of Secretary-Treasurer that he overlooked Keith's late dues payment. Though technical, standing by itself, in the context in which it was done, there was no effort made to apply the standards of qualification uniformly and they were not in fact uniformly applied.

The election of Secretary-treasurer of the defendant, Local Union 191, held December 15, 1962 must be set aside, and a new election for that office must be held. Settle order.