596 F.2d 240
 101 L.R.R.M. (BNA) 2018, 49 A.L.R.Fed. 716,
86 Lab.Cas. P 11,246
 Henry LARKINS, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Brotherhood of Railway, Airline, Steamship Clerks, Freight
Handlers, Express and Station Employees, John J.
Roche and Co., Inc., Intervenors.
 No. 78-1153.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 27, 1978.
Decided April 18, 1979.
 
 Phyllis J. Holmen, Chicago, Ill., for petitioner.
 Barbara G. Gehring, NLRB, Washington, D. C., for respondent.
 Soloman I. Hirsh, Chicago, Ill., for intervenors.
 Before FAIRCHILD, Chief Circuit Judge, PELL, and TONE, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 The petitioner, Henry Larkins, seeks review of an order of the National Labor Relations Board (Board), 231 N.L.R.B. No. 80 (1977), which reversed in part the decision of the administrative law judge (ALJ). The Board, contrary to the ALJ, found that the Brotherhood of Railway, Airline, Steamship Clerks, Freight Handlers, Express and Station Employees (Union) did not violate § 8(b)(2)[1] of the National Labor Relations Act (Act) when it demanded that John J. Roche & Company (Company) discharge Larkins for failure to pay his Union dues and reinstatement fee, and that the Company accordingly did not violate §§ 8(a)(1) and (3) of the Act by complying with the Union's demand.
 
 
 2
 The gist of Larkins' arguments in this petition for review is that the Union violated § 8(b)(2) when it demanded his discharge, because any delinquency in his dues payments was attributable to either the Union, the Company, or both, but not to him. Our analysis of Larkins' arguments requires some background statement of the facts of this case.
 
 
 3
 Larkins was employed as a lift-operator checker, and was a member of the Union. The collective bargaining agreement between the Company and the Union contained a valid union-security clause which provided in part that any employee who failed to pay union dues would be discharged from the Company.[2] Larkins had on occasions been delinquent in his dues and the Union had on occasions erred in its accounting of dues.
 
 
 4
 The events leading to the alleged dues delinquency in this case began in August 1974 when the Union gave Larkins a new dues card. The back of the card had spaces for recording dues payments. At that time Larkins paid $22.00 for two months and the Union agent indicated on the card receipt for July and August 1974. He placed a question mark in the September 1974 box to reflect Larkins' claim that he had already paid for July and thus that the $22.00 should cover September. The Union agent was to investigate this claim, but never did.
 
 
 5
 On September 11, 1974, Larkins informed Galik, the Company's timekeeper and Union sergeant at arms and recording secretary, that he wished to go on check-off, an authorized procedure by which the Company would automatically deduct his dues from his paycheck. Larkins executed the proper check-off form and Galik noted on the form that Larkins' dues were paid through August. Galik then told Larkins that he would no longer have to worry about paying his dues because they would be deducted from his pay. The check-off form was processed and deductions from Larkins' paycheck would have begun with the last paycheck in October. The Company, however, suspended Larkins for the entire month of October for tardiness and absences, and thus the Company could not deduct his dues because it did not pay him.[3] Larkins returned to work in November and his dues were properly deducted for that month. Relying on Galik's earlier assurances, Larkins did not pay September dues even though he knew that the Company had not deducted those dues from his pay. For some reason, not apparent from the record, the Company failed to check off December dues and Larkins did not tender them. After that, the check-off proceeded smoothly until Larkins' discharge from the Company on April 24, 1975. In sum, Larkins did not pay dues for September, October (retention-of-membership dues), and December.
 
 
 6
 On January 1, 1975, Jan Pappas became the Union's new financial secretary-treasurer. According to the Union's constitution, a member is automatically suspended from the Union on the last day of the second month for which he has failed to pay dues. Pursuant to this Provision, Pappas prepared and posted a list in early February of members, including Larkins, who were suspended for non-payment of dues.
 
 
 7
 Larkins spoke with Pappas on February 18 regarding his arrearage. He told her that he was on check-off and that his dues were deducted. She examined his check stubs and explained that the dues had not been deducted but promised to check further. The Union steward who was present explained to Larkins that he could lose his job for failure to pay dues. This steward testified that he subsequently had many conversations with Larkins about his dues delinquency and that Larkins maintained that the Company was responsible.[4]
 
 
 8
 On February 27, Larkins received a letter from McPherson, the Union General Chairman. The letter advised him that he was automatically suspended as of midnight October 31, 1974, for failure to pay dues for the months of September and October. The letter further stated that to reinstate his membership Larkins was required to pay a reinstatement fee of $45.00 plus dues for September, retention-of-membership dues for October, and dues for December, a total of $68.50, on or before March 7, 1975. The letter warned that failure to pay would result in a citation to management. Larkins attended a Union meeting the evening of the day he received this letter. After the meeting he offered to pay Pappas all he owed except the $45.00 reinstatement fee. Pappas refused to accept anything but the total amount owed.
 
 
 9
 When the Union did not receive payment from Larkins by the March 7 deadline, McPherson cited him to the Company in a letter dated March 10 which stated:
 
 
 10
 You are hereby advised that Henry Larkin (sic) an employe of the John J. Roche Company, has failed to comply with the terms of Rule 3 of the Clerks' Rules Agreement for the reason that he failed to pay dues for September and October, 1974.
 
 
 11
 It is therefore requested that such employe be so notified in accordance with the provisions of Rule 3(d) of the Agreement effective October 1, 1971.
 
 
 12
 The Company provided a copy of this letter to Larkins. Larkins then wrote McPherson stating that his dues for September and October 1974 should have been deducted from his paycheck. McPherson responded in a letter dated March 20 stating in part:
 
 
 13
 Although you state these dues should have been deducted, the fact remains, and your pay check stubs should have reflected, that dues were not deducted for the months of September and October, as well as December.
 
 
 14
 It is the responsibility of every member to know when his dues are payable and to pay them. This is brought to the attention of every member through a NOTICE in Railway Clerk/Interchange every month.
 
 
 15
 On March 24, Larkins met for two hours with Pappas, Zonka, the Union steward, and Terselich, the president of the Company. Larkins offered to pay $68.50, the whole amount he owed. Pappas accepted only the $45.00 reinstatement fee. Three days later, Larkins renewed his offer to pay the $23.50 balance, but Pappas again refused it. Then Pappas was informed by McPherson that she had erred in accepting the $45.00 because Larkins had not yet been terminated. She allegedly had accepted only the reinstatement fee believing that Larkins had already been terminated and was to be rehired as a new employee. The $45.00 was refunded to Larkins on March 31.
 
 
 16
 The Company formally notified Larkins of the Union's request for termination and, at Larkins' request, a hearing was held on April 7. Larkins maintained that the delinquency was not his fault. On April 24, the Company advised Larkins that in accordance with the provisions of Rule 3 of the collective bargaining agreement his seniority and employment were terminated as of that day. On May 6, Pappas refunded $55.00 to Larkins, representing his dues deductions for January through May, when no deductions should have been made in view of his prior suspension from membership. The Company rehired Larkins as a new employee on May 9.
 
 
 17
 The law is quite clear that a union may cause an employee's discharge pursuant to a union security clause only for "failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." § 8(b)(2). See N.L.R.B. v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). Larkins argues that the Union violated § 8(b)(2) because it caused his discharge even after he tendered all his delinquent dues on February 27, 1975. The Union did not accept this tender because Larkins refused to pay the reinstatement fee. Larkins admits that the Union bylaws require payment of a reinstatement fee by a suspended member, but he argues that this fee may not be imposed on an employee who has been suspended as a result of the union's and the employer's misfeasance.
 
 
 18
 In essence, a union seeking to enforce a union security clause has a fiduciary duty to deal fairly with the employee and to "inform (him) of his obligations in order that the employee may take whatever action is necessary to protect his job tenure." N.L.R.B. v. Local 182, International Brotherhood of Teamsters, 401 F.2d 509, 510 (2d Cir. 1968), Cert. denied,394 U.S. 213, 89 S.Ct. 1010, 22 L.Ed.2d 209 Quoting N.L.R.B. v. Hotel, Motel and Club Employees' Local 568, 320 F.2d 254, 258 (3d Cir. 1963). In the present case, the Board found that the Union properly fulfilled its fiduciary obligations before seeking Larkins' discharge, and we agree. The Union's rule that members who fail to pay dues within the prescribed time limits will be automatically suspended without notice appears in the Union's statutes, as well as on Union membership cards and in monthly issues of "Railway Clerk Interchange" magazine. That suspended members are required to pay a reinstatement fee is also clearly stated in the Union's statutes. Thus, the Union insured that its members were informed of their obligation to pay dues and the consequences of ignoring this obligation.
 
 
 19
 Larkins cannot escape responsibility for paying his dues on the theory that once he executed the check-off documents his obligations shifted to the Union and the Company.[5] He could have determined from his paychecks that no dues deductions were made for September and December. Moreover, he should not have expected his dues for September to be deducted because dues for the month are payable and due on the first day of the month, and he did not execute the check-off documents until September 11. As for October, even if the check-off authorization had been processed by then,[6] Larkins did not work that month and thus could not have expected his dues to be deducted. Furthermore, his obligation to pay $1.50 retention-of-membership dues for October was clear. Accordingly, he was automatically suspended on October 31 and could be reinstated only by paying his unpaid dues plus the reinstatement fee.
 
 
 20
 Because the Union did not breach its fiduciary duty in suspending Larkins for delinquent dues, and because the Union may cause an employee's discharge for failure to pay a lawful reinstatement fee,[7] the Union did not violate the Act by refusing to accept Larkins' tender on February 27 of back dues without a reinstatement fee. See N.L.R.B. v. International Union of Operating Engineers, Local 139, 425 F.2d 17, 19 (7th Cir. 1970).
 
 
 21
 In March 1975, Larkins twice tendered both back dues and the reinstatement fee. He contends that the Union violated the Act by continuing to demand his discharge after these tenders. The Board found, however, and we agree, that these tenders were not timely. Therefore, the Union could legitimately reject such tenders and still demand the employee's discharge. If an employee tenders dues and reinstatement fees after the Union has requested the Company to discharge him, the Union may reject the tender and continue to seek his discharge without violating § 8(b)(2). The Second Circuit articulated the reasoning underlying this rule:
 
 
 22
 If labor organizations are to be allowed effective enforcement of union security provisions, they must be free to invoke the sanction of loss of employment against those union members who are delinquent in tendering their periodic dues. This sanction might become meaningless if an employee could avoid its impact by an eleventh hour tender of back dues just prior to actual discharge.
 
 
 23
 International Association of Machinists v. N.L.R.B., 247 F.2d 414, 420 (2d Cir. 1957). See also General Motors Corp., Packard Electric Division, 134 N.L.R.B. 1107 (1961); Acme Fast Freight, Inc., 134 N.L.R.B. 1131 (1961). We are not unmindful that the telling of Larkins' tale of woe generates sympathy for the plight he found himself in as a result of what could properly be termed a comedy of errors. While the Company and the Union were not without fault in the unfolding drama, Larkins had the last Act opportunity to add a happy conclusion to the scenario. In any event, we think reaching any other result would be unfortunately based upon sympathy which would not justify overriding the important public policy enunciated in the Second Circuit case quoted above.
 
 
 24
 Larkins also argues that this rule does not apply in the present case because the Union's March 10 letter to the Company did not constitute a demand for his discharge, and therefore, his March 24 and 27 tenders were timely made. Although the letter does not state on its face that the Union is demanding Larkins' discharge, its reference to Rule 3 and its request that Larkins be notified pursuant to Rule 3(d) leave no doubt that it was a demand for his discharge. See note 2 Supra; Acme Fast Freight, Inc., 134 N.L.R.B. 1131 (1961). Indeed, the Company understood that the Union's March 10 letter was a request for Larkins' discharge. Its March 31 letter to Larkins stated that the Union "has asked that your service and seniority be terminated." Moreover, as the ALJ noted, "If the March 10 citation was not a request for discharge I fail to understand the theory of General Counsel's case against the Union. There is no other request for discharge in the record."
 
 
 25
 Under Rule 3(d), the employee may request a hearing to dispute his dues delinquency, but unless he proves that he is not in violation of the Rule, he "Shall be released" from service. (Emphasis added.) The Union need not make a demand for discharge after the hearing. The only affirmative action required of the Union is to notify the Company pursuant to Rule 3(d) as the Union did in its letter of March 10. Cf. N.L.R.B. v. Aluminum Workers, Local 135, 230 F.2d 515, 520 (7th Cir. 1956).
 
 
 26
 Larkins raises another issue regarding his March 24 tender of dues and reinstatement fee. Although he offered to pay the full $68.50, Pappas accepted only the $45.00 reinstatement fee. Larkins argues that by accepting this $45.00 the Union waived its right to continue to seek his discharge. In the proper circumstances, when a union accepts even a partial tender of this sort after it has requested that the Company discharge the employee, but before the actual discharge, it waives its right to pursue the discharge. See N.L.R.B. v. Teamsters, Local 85, 458 F.2d 222, 225 (9th Cir. 1972); Teamsters, Local 200, 155 N.L.R.B. 273 (1965); Colgate-Palmolive Company, 138 N.L.R.B. 1037 (1962); F. J. Burns Draying, Inc., 129 N.L.R.B. 252 (1960).
 
 
 27
 The present case is distinguishable from these cases because the Union returned the $45.00 to Larkins a week later allegedly because it was accepted in error. In U. A. W., Local 1772, 210 N.L.R.B. 798, 801 (1974), the union agent accepted delinquent dues before the employee was discharged. When union officials were informed of this action, they promptly returned the dues (within one hour of payment) and then the employee was discharged. The Board held that the union did not accept the dues and emphasized that "in the very short interval of one hour's time the Union . . . took immediate steps to correct the situation." Id.
 
 
 28
 Thus, if the tender was accepted in error and the union acted promptly to return the payment, it will be deemed not to have accepted it for purposes of the waiver determination. We must add, however, that the determination of whether the Union waived its right to pursue the discharge also depends on the circumstances of the acceptance. Waiver is the intentional relinquishment of a known right and thus entails some inquiry into the motive of the party against whom it is applied. See Fey v. Walston & Co., 493 F.2d 1036, 1050 (7th Cir. 1974).
 
 
 29
 In the present case, the Union acted promptly in returning the $45.00 after it recognized its mistake in accepting it. Moreover, the circumstances of the acceptance of the $45.00 do not militate in favor of finding a waiver. Pappas testified that she accepted the $45.00 under the mistaken impression that Larkins had already been discharged and that he was to be rehired as a new employee.[8] Because waiver presupposes knowledge of all material facts of one's rights, together with a willingness to refrain from enforcing those rights, it should not be applied to this case in which the Union did not exhibit the requisite knowledge and intent. See Klein v. American Luggage Works, Inc., 52 Del. 406, 158 A.2d 814, 818 (1960).
 
 
 30
 For these reasons, we deny Larkins' petition for review of the Board's order that the Union did not violate § 8(b)(2) by demanding Larkins' discharge and consequently that the Company did not violate §§ 8(a)(1) and (3) by complying with the Union's demand.
 
 
 
 [1]
 Section 8(b)(2) provides:
 It shall be an unfair labor practice for a labor organization or its agents to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.
 
 
 [2]
 Rule 3(d) of the agreement provides:
 (d) BRAC will notify Company of employees who fail to tender their application and fee within the time limits specified above; or employes who fail to tender uniform dues within the required time. Upon receipt of such notice, the Company will, within ten (10) calendar days of such receipt, so notify the employe concerned in writing by Registered Mail return receipt requested or by personal delivery evidenced by receipt. Copy of such notice to be furnished the BRAC representative who cited the employe. An employe so notified who disputes the fact that he has failed to comply with the terms of this Rule shall within a period of ten (10) calendar days from receipt of such notice, request the Company in writing by Registered Mail, return receipt requested, or by personal delivery evidenced by receipt, to accord him a hearing. Upon receipt of such request the Company shall set a date for hearing which shall be held within seven (7) calendar days of the date of request therefor. Notice of the date set for hearing shall be promptly given the employe in writing with copy to the BRAC, by Registered Mail, return receipt requested, or by personal delivery evidenced by receipt. A representative of BRAC shall attend and participate in the hearing. If it is found that the employe is in violation of the provisions of this rule, he shall be released and have his service and seniority terminated as soon as a qualified replacement can be secured, but in no case later than thirty (30) calendar days from date of hearing.
 
 
 [3]
 Under the Union's constitution, retention-of-membership dues of $1.50 per month are required to be paid by the member in such circumstances, and Larkins admittedly knew this. Nevertheless, he did not pay this $1.50 for October dues
 
 
 [4]
 The Union steward also testified that when he explained to Larkins the consequences of non-payment, Larkins just laughed and said, "I got it beat."
 
 
 [5]
 Larkins cites English v. Cunningham, 106 U.S.App.D.C. 70, 91, 269 F.2d 517, 538 (1959), and Wirtz v. Teamsters, Local 191, 226 F.Supp. 179, 185 (D.Conn.1964), in support of this theory, neither of which provided sufficient support. In English, the employer deducted the dues pursuant to a check-off, but delayed payment of those dues to the union. The court found that the employee was not delinquent, and properly so, because the employee cannot be expected to monitor the employer's records to be sure that the employer promptly pays the union. In the present case, the employee was expected only to be sure that his dues were deducted, and if not, to tender the dues himself
 Wirtz involved an employee who was prohibited from running for union office because his dues were checked off "in any week which suits (the employer's) fancy" and consequently his dues were paid late. 226 F.Supp. at 185. The court held that the employee was improperly disqualified as a candidate because the union "acquiesced in a check-off practice completely and continuously at variance with the formal check-off agreement," and because the employee made the payments requested well before the election. In the present case, in contrast, there is no evidence that the Company or the Union deviated from their normal procedure in implementing Larkins' check-off, nor was the Company late in reimbursing the Union for dues collected. Even if Wirtz might have some application to the Company's failure to check off December dues, we need not reach that issue because Larkins was properly suspended by the Union on October 31.
 
 
 [6]
 The Board found that any delay in processing the check-off "was due to the normal administrative hiatus involved in effectuating a change in the deductions from an employee's paycheck," and "that there is absolutely no evidence in the record . . . that the Union was 'negligent' in not giving notice to the employer that Larkins was now going to have his dues checked off. . . ." 231 N.L.R.B. No. 180 at 3-4
 
 
 [7]
 The Union's by-laws provide for the payment of a reinstatement fee after suspension from membership. Article 7 specifically states that suspended members may apply for reinstatement upon payment of a reinstatement fee plus any unpaid dues
 
 
 [8]
 Although the ALJ found it unnecessary to resolve the factual question of whether Pappas actually believed Larkins to have been terminated at the time she accepted the $45.00, the ALJ found Pappas "generally more credible than Larkins." Furthermore, Pappas' acceptance of only the reinstatement fee and her refusal to accept the delinquent dues is consistent with and supports her testimony