Jesse COLPO, Plaintiff,

v.

GENERAL TEAMSTERS LOCAL UNION 326 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA; Francis J. Sheeran; Thomas P. Byron; and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants.

Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

LOCAL 326, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.

Civ. A. Nos. 79–514, 80–181.

United States District Court, D. Delaware.

Dec. 24, 1980.

**574**

James W. Garvin, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., Edward T. Ellis, U. S. Dept. of Labor, Philadelphia, Pa., for plaintiff Marshall.

Sheldon N. Sandler, Bader, Dorsey & Kreshtool, Wilmington, Del., Gary S. Witlen, Washington, D. C., for defendant Local 326.

Roderick R. McKelvie, James McC. Geddes, Robinson, McKelvie & Geddes, Wilmington, Del., for plaintiff Colpo.

## OPINION

STAPLETON, District Judge:

This Opinion constitutes the Court's findings of fact and conclusions of law after a trial on the merits of two consolidated actions arising under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401, *et seq.* (the "Act"). Both actions present challenges to the November 4–5, 1979 election for the office of President and Business Representative of General Teamsters Local Union 326 ("Local 326"), a local labor organization affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "International").

Civil Action No. 79–514 arises under Title I of the Act. Plaintiff Jesse Colpo, a member of the International and Local 326, alleges that Local 326, Local President Francis J. Sheeran, Local Secretary-Treasurer Thomas J. Byron, and the International violated Section 101(a) of the Act by interpreting certain sections of the International's constitution and the Local's by-laws in a discriminatory manner, with the result that he was declared ineligible to stand for election for the office of President of Local 326 at the November 1979 election.

The plaintiff in Civil Action No. 80–181 is the Secretary of Labor (the "Secretary"), whose cause of action arises under Title IV of the Act. The Secretary alleges that

Local 326 violated Section 401(e) of the Act by denying Jesse Colpo the right to be a candidate and to hold office, and by denying other union members in good standing the right to vote for or otherwise support his candidacy.

Both plaintiffs seek an order declaring void the November 1979 election of Francis J. Sheeran to the position of Local 326 President, and an order directing defendant Local 326 to conduct a new election.

Jesse Colpo has been a member of Local 326 since it was issued a charter by the International Union in August 1967, and has been a member of other Teamsters locals since 1938. Since becoming a member of Local 326, Colpo has been employed by Interstate Motor Freight System ("Interstate") at its Wilmington, Delaware terminal. Interstate is a party to the National Master Freight Agreement ("NMFA") and Colpo has executed and delivered to Interstate a check-off authorization form as provided in the Agreement.

In December of 1976, Local 326 submitted its monthly dues check-off form to Interstate in accordance with its usual practice. The list shows that Interstate was asked to deduct dues for eight employees, including Jesse Colpo. Although Colpo worked each week during that month of December, Interstate failed to deduct dues for him. Instead, the company returned the check-off form to Local 326 with only two of eight names checked off, and a dues payment for only two of those members, neither of which was Mr. Colpo.

The first time Jesse Colpo learned that there was an alleged arrearage in his dues was in February of 1978, when a notation appeared on his monthly dues receipt that he was one month behind in his dues. The notation did not indicate which month Colpo allegedly had missed. Colpo testified that after reading the note, he returned home and reviewed his payroll check stubs but found no missed dues payment from February 1978 to January of 1977; he stated that he did not check back as far as

December 1976. Colpo testified that he relied on these payroll stubs from his employer and hence took no action.

Upon becoming aware of the delinquency, the Local's bookkeeper "collapsed" and dues payments made subsequent to December 1976 (applying January 1977 dues to December 1976, February 1977 dues to January, and so on) thus making Colpo one month in arrears for the current month. Evidence at trial indicates that this was standard practice.

In March of 1978, Colpo's union steward, David Wilkes, told Colpo that he was one month behind, and offered to take him down to the Local office to have the matter clarified. Colpo believed there was no problem and declined to act. Thereafter, each month, the bookkeeper at Local 326 made the same notation on Colpo's monthly dues receipt: "one month behind".[1]

In January of 1979, Colpo was injured on the job and missed a number of work weeks in both January and February. He missed several payrolls and noted from his payroll stubs that Interstate had failed to deduct his union dues from his wages for any time during the month of February, 1979. Colpo's status was thereafter described on the dues receipts as "two months behind". In August, Colpo wrote to the company requesting a double dues deduction to resolve the February delinquency. That deduction was made in September 1979.

On September 30, 1979, Colpo was nominated to run for the office of President of Local 326 in the November election. By letter dated October 4, 1979, he was ruled ineligible by Local 326 Secretary Thomas Byron. Byron stated that Colpo had failed to maintain "continual good standing" for the 24–month period preceding nominations based on the December 1976 and the February 1979 arrearages. On October 26, 1979, Colpo wrote to Frank F. Fitzsimmons, President of the International, and appealed the Local's decision. Fitzsimmons sustained the Local's ruling on the basis of the December

1. Colpo did not become current in his dues until October 1979, after the nomination meeting, when he made a cash payment at the Local 326 hall.

1976 arrearage.[2] The election was held on November 4–5, 1979, without Jesse Colpo as a candidate. Frank Sheeran was re-elected President of Local 326.

Local 326, consistent with the International's constitution and with federal statute, conducts elections of officers once every three years. Members seeking office in local unions of the Teamsters must satisfy the candidate's eligibility requirements set forth in the International's constitution and incorporated in the Local's by-laws. Specifically, Article II, Section 4(a)(1) of the Constitution provides:

> To be eligible for election to any office in a Local Union, a member must be in continuous good standing in the Local Union in which he is seeking office, and actively employed at the craft within the jurisdiction of such Local Union, for a period of twenty-four (24) consecutive months prior to nomination for said office and must be eligible to hold the office if elected. "Continuous good standing" means compliance with the provisions of Article X, Section 5 concerning the payment of dues for a period of twenty-four (24) consecutive months....

Article X, Section 5(c) defines "good standing status" as requiring payment of monthly dues "on or before the last business day of the current month." While that provision also provides that payment of dues after their dues date does not restore good standing status for purpose of election eligibility under Article II, Section 4(a)(1), the International has permitted members on dues check-off a reasonable grace period within which a dues arrearage might be corrected without a loss of good standing status. The practice of allowing a cure by payment within a "reasonable time" after

being advised of an arrearage was not reduced to writing.

Plaintiff Colpo alleges that his disqualification was discriminatory, and, as such, violated Section 101 of the Act. (29 U.S.C. § 411).[3] The record does not support this claim. There simply is no evidence suggesting that Colpo was treated in a manner different than any other similarly situated union member or that the defendants have in any way been inconsistent in their interpretation and application of the relevant rules.

The remaining issue is whether Colpo's disqualification violated Section 401 of the Act (29 U.S.C. § 481). The Secretary asserts that it did for two reasons. First, he argues that that disqualification was inconsistent with a portion of Subsection (e) which speaks to the disqualification of members on dues check-off. 29 U.S.C. § 481(e). Second, the Secretary points out that the interaction of the 24–month good standing rule and collapsing dues rule results in a situation where an alleged dues deficiency can result in a disqualification even though it originated years before the election. He claims that it is, therefore, unreasonable to apply these two rules in tandem in the absence of a reliable system for giving notice of dues deficiencies and without written publication of the right to cure defaults during a grace period. Since the Secretary considers Local 326's notice system inadequate and since there concededly has been no written publication of the grace period practice, the rules applied to disqualify Colpo are said to violate that portion of Subsection (e) which requires that any qualification for candidacy be "reasonable."[4]

---

2. The International held that the February 1979 arrearage was corrected within a reasonable time and thus caused no loss of good standing. (Tr. A–103).

3. 29 U.S.C. § 411(a)(1) reads:

> Equal Rights—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization ... subject to

reasonable rules and regulations in such organization's constitution and bylaws.

4. 29 U.S.C. § 481(e) reads in part:

> In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every *member in good standing shall be eligible to be a candidate* and to hold office (subject to section 504 of this title and to *reasonable qualifications uniformly imposed*) and shall have the right

Taking the second charge first, I find that this case simply does not raise the issue which the Secretary seeks to litigate. This is not a case, like the one hypothesized in the Secretary's brief, where a union member has failed to seize an opportunity to avoid disqualification, either because of inadequate notice of a deficiency or because he was misled into thinking he had no grace period in which to correct the deficiency. Colpo was disqualified because he failed to pay an arrearage within a reasonable time after February of 1978 when he concededly received written notice of the alleged deficiency,[5] and the fair inference from Colpo's own testimony is that he was aware that one could avoid disqualification during the 24-month period by making payment within a reasonable time.[6] He failed to make such a payment not because he was unaware of the grace period but rather because he was convinced there was no arrearage.[7] Since the practices which the Secretary challenges have not been shown to have had any impact on Local 326's election of officers in 1979, the unreasonableness of those practices would not entitle him to overturn the results of that election.

The Secretary's other argument has merit, however. Interstate's failure to make a dues deduction of $12 for Colpo during December of 1976 was caused by employer error. Colpo had authorized the automatic dues check-off procedure, he had sufficient wages coming that month during the relevant week, and the union had submitted Colpo's name that month for check-off. Under Article III, Section 3 of the NMFA, it was Interstate's contractual obligation to deduct those dues; it failed to do so. These facts and Colpo's resulting dis-

qualification raise an important issue regarding the proper construction of the following portion of subsection (e):

> No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues.[8]

The unions argue that this provision protects the franchise and candidacy rights of a member on check-off only in those instances where the employer has deducted dues for the specific period involved in the alleged deficiency but has failed to remit said dues to the union. It would thus come into play when a deduction has been made but there has been no timely payment because of the employer's appropriation of the funds to his own use or bankruptcy. The Secretary, on the other hand, reads the phrase "member whose dues have been withheld ... pursuant to his voluntary authorization" as referring to any union member whose dues have been withheld as a matter of course under a check-off provision of a collective bargaining agreement.

It must be conceded that both readings of the statute are permissible ones. However, I believe the Secretary's interpretation is more consistent with the purpose of the provision and the legislative history of the Act[9] and, accordingly, I adopt it. The relevant legislative history reveals a Congressional commitment to free and democratic elections as the primary means of insuring union responsiveness to the rank and file.

---

to vote for or otherwise support the candidate or candidates of his choice. (emphasis added).

5. While this notification did not specify when the arrearage initially arose, the bookkeeping ledger maintained by the Union revealed this information and it was readily available to Colpo upon request. I do not consider this aspect of the notification system to be unreasonable.

6. Tr. A–16–17, 48–50.

7. Tr. A–12, 14, 18, 27, 61.

8. This part of Section 481(e) is restated in substance in the International's constitution in Article XII, Section 4(a), and in the Local 326 by-laws at Section 16(c)(2).

9. The primary Congressional concerns when passing this legislation are reviewed by the Supreme Court in *Wirtz v. Hotel, Motel, and Club Employees,* 391 U.S. 492, 497–98, 88 S.Ct. 1743, 1746–47, 20 L.Ed.2d 763 (1967).

Congress concluded that statutory protection for the franchise and candidacy rights of union members was essential if free and democratic elections were to occur. The particular provision here under consideration was intended to assure members who had made adequate provision for the payment of their dues that these rights could not be stripped from them because of the defaults of others. The Union's construction would limit its operation to situations involving certain types of defaults by the employer; the Secretary's reading would provide protection in all situations in which a breach of the check-off provision of the contract has resulted in an alleged delay or default in the payment of a member's dues. The legislative history of the Act suggests no rational basis for the limits which the Union seeks to impose; the scope accorded by the Secretary's reading would appear to be consistent with the scope of the problem which Congress sought to remedy.

The Secretary's view is also supported by the sparse case law which has addressed the issue. In *Wirtz v. Local 191, International Brotherhood of Teamsters*, 226 F.Supp. 179 (D.Conn.1964), a Teamster union member had been declared ineligible to run for office because he had failed to make timely payment of his dues for one of the twenty-four months immediately preceding the election. The Court found that the alleged dues default occurred because the union acquiesced in a company breach of the terms of the check-off provision of the applicable collective bargaining agreement. The court observed:

> If the employer and the Union had adhered to the provisions of the written authorization, which was the only source of authority they had to check-off and receive Kyer's wages, Kyer's July dues would have been paid.

226 F.Supp. at 184. The Court went on to set forth its view of the relative responsibilities of the union, employer, and employee/member in the check-off situation:

> It is not up to the individual employee to take issue with the employer where the employer departs from the terms of the check-off system instituted under the terms of the collective bargaining agreement. It is only where the employee has not been employed and is not on the payroll for the payday on which the check-off is authorized to be made that he must see to it that he pays his dues himself in advance. Otherwise the rights of union member employees under Title 29 U.S.C. § 481(e) could be too easily lost or rendered nugatory or even destroyed through connivance or chicanery.

226 F.Supp. at 185. Relying on Section 401(e), the Court held that a member who was on check-off could not lawfully be declared ineligible for union office for a dues default.

This was also the conclusion of the District Court in *Goldberg v. Amarillo General Drivers, Teamsters Local Union No. 577*, 214 F.Supp. 74 (N.D.Tex.1963), in which the Court stated:

> It justly follows that all of the disqualifications ruled against said members for alleged late payment of dues rested on instances which reflected on the part of the particular employer in the discharge of the check-off plan and, accordingly, that said members are shielded from any prejudice in this connection under § 481(e).

214 F.Supp. at 79.

I hold that an employer's breach of its obligations under a check-off agreement may not occasion the disqualification of a union member who has made provision for the payment of his dues by authorizing a check-off and by working during the pertinent period. Congress has determined that the political rights of union members are too precious to be subjected to risks which would attend a contrary holding.

The Secretary is entitled to an order for a supervised election if the enforcement of the challenged rule or by-law "may have affected" the outcome of the November 1979 election. 29 U.S.C. § 482(c). Here, evidence at trial indicated that Jesse Colpo was a proven vote-getter and that his absence as a candidate for election may well have had an effect on the outcome. Ac-

cordingly, the November 1979 election for President of Local 326 is set aside and a new election is hereby ordered under the supervision of the Secretary of Labor.

Since Colpo has failed to prove a violation of Title I, there can be no damage award. However, courts have recognized the important role of intervening plaintiffs in Title IV cases, and have, under some circumstances, awarded equitable relief in the form of attorneys' fees and costs. *Brennan v. United Steelworkers of America*, 554 F.2d 586 (3d Cir. 1977), *cert. denied* 435 U.S. 977, 98 S.Ct. 1627, 56 L.Ed.2d 72. *See also Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1972). Since the parties have not addressed this issue, the Court will schedule a hearing on the question of whether as yet attorneys' fees should be awarded and, if so, in what amount.